399 F.Supp.2d 973 (2004)
THE SCHATZ FAMILY, et al., Plaintiffs,
v.
Lynne GIERER, et al., Defendants.
No. 4:00 CV 00489 ERW.
United States District Court, E.D. Missouri, Eastern Division.
March 24, 2004.
*974 *975 Richard D. Sabbert, St. Charles, MO, for Plaintiffs.
Paul M. Rauschenbach, State of Missouri Attorney General's Office, Priscilla F. Gunn, Rabbitt, Pitzer & Snodgrass, P.C., Kevin T. Lake, Lake & Gantz, Kenneth C. Brostron, Lashly & Baer, P.C., Robert L. Brady, Robert W. Cockerham, Brown & James P.C., Michael P. Bastian, St. Louis, MO, Daniel A. Brackmann, Daniel M. Buescher, Buescher & Franke, Washington, MO, William L. Berry, Dunham & Boman, Belleville, IL, David E. Overby, Harrison & Hyde, Springfield, MO, for Defendants.

MEMORANDUM AND ORDER
WEBBER, District Judge.
Before the Court are Defendant Marsha Roy's Motion for Summary Judgment [doc. # 293]; a Motion for Summary Judgment by Defendants Ozark Youth Residential Services, Mark Owings, and Woodrow Friel [doc. # 295]; Defendant Timothy Jones's Motion for Summary Judgment [doc. # 296]; Defendant Vicki Simmons's Motion for Summary Judgment [doc. # 299]; Defendant Cheryl Savage's Motion for Summary Judgment [doc. # 300]; a Motion for Summary Judgment by Defendants Fee-Fi-Fo-Fun Day Care, Joanne Gratzer, and Stephanie Light [doe. # 303]; a Motion for Summary Judgment by Defendants James Powers, Judith Schechtman, Monica Houttuin, Dina Vitoux, Joseph Long, and Robert Schnidman [doe. # 304]; a Motion for Ruling on Qualified Immunity by 21 defendants [doe. # 356]; *976 and Defendant Marie Clark's Motion to Dismiss [doc. # 362].
I. Background
A. Procedural history
Plaintiffs Andy and Joanne Schatz have eleven children, currently ranging in ages from 13 to 26. On October 22, 1990, the Missouri Division of Family Services, Franklin County (DFS), removed Joy, Charity, Angel, Rebekah, Jonathan, Deborah, Rachel, Sarah, Timothy, and Abigail Schatz from their parents' home involuntarily and placed them in various foster homes. David Schatz, the youngest child, was removed in November 1992. Joy, Charity, and Angel Schatz, the three oldest children, were not returned to the custody of their parents because they eventually reached the age of majority. Rebekah, Rachel, Sarah, Timothy, Abigail, and David were returned home in 1995, and Jonathan and Deborah were returned in 1997.
Andy and Joanne Schatz and ten of their eleven childrenJoy, the oldest child, is not a plaintiffbrought suit against the Missouri Department of Family Services, and numerous other defendants under 42 U.S.C. §§ 1983 and 1985(3), alleging several violations of the federal constitution as well as an overarching conspiracy to commit those same violations. Plaintiffs have amended their complaint twice, and the Third Amended Complaint named 49 defendants. The Third Amended Complaint recites 60 paragraphs of allegations common to all counts against the various Defendants and lists 12 causes of action. The thrust of the Complaint is that certain defendants conspired to remove the Schatz children from the family home, and certain defendants made erroneous conclusion that resulted in the children being placed in foster homes where they were emotionally and sexually abused. The Complaint also accuses certain defendants of interfering with the parents' wishes on how to raise the children. The childrens' claims are premised on their right to the enjoyment of each others' association. The 12 causes of action are: (1) denial of right to liberty interest in the care and companionship of parents and children as guaranteed by the Fourteenth Amendment; (2) denial of the First Amendment right to petition the courts; (3) denial of the children's rights as siblings in their liberty interest in the family, companionship and society and the intimate association of one another; (4) violation of the parents' right to parental control over the religious training of children as guaranteed by the First Amendment and Mo. Rev.Stat. § 211.221; (5) violation of the childrens' rights to substantive due process and privacy for protection from harm as well as the right to protection from unreasonably and unnecessary intrusions into their emotional and physical well-being under the Fourth and Fourteenth Amendments; (6) violation of the childrens' substantive due process rights under the Fourteenth Amendment to be free from the infliction of unnecessary harm to children in State regulated foster homes; (7) denial of the children's rights when placed in State custody to reasonably safe conditions of confinement; (8) denial of the Plaintiffs' substantive constitutional rights in the preservation of family integrity under the First Amendment's broad right of association and the Fourteenth Amendment's general substantive due process protections; (9) denial of the Plaintiffs' rights given to them pursuant to the funding statutes for child welfare and as implemented under the various statutes of the State of Missouri including, but not limited to, Chapters 207, 210, and 211 and the regulations promulgated thereunder in 13 CSR Division 40; (10) denial of the Plaintiff's rights as to privacy *977 and their liberty and due process rights, privileges, immunities and guarantees and procedural safeguards as provided and guaranteed under the First, Fourth, Fifth, Ninth, and Fourteenth amendments to the Constitution of the United States in the care and companionship of parents and children for one another and the integrity of the family unit.; (11) state law negligence; and (12) false imprisonment of the Schatz children.
On September 27, 2002, this Court considered motions to dismiss of 26 defendants, and motions for summary judgment of five. The 26 defendants[1] moved to dismiss based on qualified immunity, but the Court denied their motions. Twenty-one of those defendants appealed the Court's ruling to the United States Court of Appeals for the Eighth Circuit.[2] The Court also granted summary judgment in favor of Defendants Bonnie Wessler, Alpha for Adolescents, Glenda Edwards, Wendy Jackson, and Peggy Bridges. On May 9, 2003, the Court granted summary judgment to Defendants Deborah Schlitt, Jackie Fischer, Glen Kuehn, and Robert Schlitt.
In October 2003, the Eighth Circuit dismissed the appeal of the 21 "motion-to-dismiss defendants" for lack of appellate jurisdiction, finding that despite this Court's denial of the defendants' motions to dismiss, it failed to clearly rule on the ultimate issue of whether the defendants were entitled to qualified immunity. Schatz Family ex rel Schatz v. Gierer, 346 F.3d 1157, 1160 (8th Cir.2003). Those 21 defendants are before this Court again seeking a ruling on the qualified immunity issue. The remaining defendants in the case have all moved for summary judgment, with the exception of Priscilla Grier, who is dead,[3] and Marie Clark, who filed a motion to dismiss. In this opinion, the Court disposes of the claims of the remaining defendants, and clarifies its conclusions reached in its earlier orders.[4]
II. Discussion
A. Rulings applicable to all defendants
(1) Common allegations
In paragraphs 72 through 123 (excluding paragraph 99) of the Third Amended Complaint, Plaintiffs attempted to allege facts common to all counts against the various defendants. They did not, however, allege specifically how each defendant deprived the Plaintiffs of their constitutional rights. *978 Because a defendant's liability under 42 U.S.C. § 1983 is founded only on a particular defendant's, personal involvement in unlawful activity, see Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir.1990), this Court ruled, in both its September 27, 2002, and May 9, 2003 orders, that the plaintiffs may not rely on the allegations in paragraphs 72 through 123 (excluding paragraph 99) of the Third Amended Complaint to support their claims for relief. That conclusion applies equally here, and as a consequence, no defendant is liable for the allegations in those paragraphs.
(2) Statute of limitations
As the Court recognized in its both its September 27, 2002, and May 9, 2003 orders, the statute of limitations for certain plaintiffs and certain claims has expired. The applicable statute of limitations for § 1983 actions is Mo.Rev.Stat. § 516.120, which provides for a five-year time limit. See Lovejoy v. Goodrich, 798 F.2d 1201, 1202 n. 2 (8th Cir., 1986) (internal citations omitted). The plaintiffs filed their original Complaint on March 23, 2000, and alleged acts which occurred between 1989 and March 3, 1995, all of which predate the five-year limitations period. This Court concluded in its earlier orders that the Missouri savings statute applied because the plaintiffs filed a similar lawsuit on April 8, 1998 and voluntarily dismissed it. See Mo.Rev.Stat. § 516.320. Under the savings statute, if a plaintiff brings an action within the applicable limitations period and suffers a nonsuit, that plaintiff may bring a new action within one year of the nonsuit. Id.
Plaintiffs Andy and Joanne Schatz (the parents), therefore, are barred from asserting § 1983 claims against any defendant for acts occurring before April 8, 1993, but not for acts occurring after that time. In addition, for any Schatz child for which the cause of action accrued when the child was under 21 years of age, the statute of limitations is tolled until that child turns 21. See Mo.Rev.Stat. § 516.170. Charity Schatz, the oldest of the child plaintiffs, was born on August 29, 1977, and did not turn 21 until August 29, 1998. The Complaint was filed on March 23, 2000, well within the five-year time limit for her claims. As all of the remaining children plaintiffs are younger than Charity, no Schatz child is barred from asserting any § 1983 claim against any defendant.
B. The motion-to-dismiss defendants
(1) Heightened pleading requirements
The defendants argued in their original motion, and again on appeal, that this Court should have dismissed the entire Third Amended Complaint for failure to meet the Eighth Circuit's heightened pleading requirements for § 1983 actions against government officials. Edgington v. Missouri Department of Corrections, 52 F.3d 777, 779-80 (8th Cir.1995). Because this area is fraught with confusion, the Court here explains to the reader its understanding of the continued vitality of the heightened pleading standard for § 1983 actions against government officials, and its understanding of how the pleading requirements for such actions coexist with the qualified immunity defense.
In Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court articulated two federal pleading corollaries. First, the court noted that "a complaint should not be dismissed for failure to state claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." Id. at 45-6, 78 S.Ct. 99. Secondly, the Court was clear on what it considered to be the requisite factual detail:
The Federal Rules of Civil Procedure do not require a claimant to set out in *979 detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.
Id. at 47, 78 S.Ct. 99. Based on these principles, the Eighth Circuit has noted, a court should grant a Rule 12(b)(6) motion only where a plaintiff "includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Krentz v. Robertson, 228 F.3d 897, 905 (8th Cir.2000).
According to one commentator, the Eighth Circuit firmly adopted a fact-pleading standard for plaintiffs alleging civil rights violations in Morton v. Becker, 793 F.2d 185 (8th Cir.1986). See Thomas 0. Main, Procedural Uniformity and the Exaggerated Role of Rules: A Survey of Intra-State Uniformity in Three States That Have Not Adopted the Federal Rules of Civil Procedure, 46 Vill. L.Rev. 311, 356-57 (2001). In Morton, the police department seized a car from the customer of an automobile dealer under the belief that the car was stolen when the dealer sold it. During the seizure, the police department placed a "hold order," on the car, identifying it as stolen. The police later returned the car to the customer, along with a Vehicle Examination Certificate which stated that the car had not been stolen. The Certificate also states that copies of the Certificate were to be mailed to the state Department of Revenue and Highway Patrol Headquarters. The dealer bought the car back from his customer, apparently in an effort to protect his reputation, and demanded that the police department either lift the hold order or issue an affidavit to the Department of Revenue stating that the car had not been stolen. When the police department refused, the dealer sued the police department under 42 U.S.C. § 1983, alleging that the police department deprived him of a protected property interest without due process of law. The plaintiff's theory was that the police department's refusal to lift the hold order or issue an affidavit to the Department of Revenue, resulted in his inability to obtain a new certificate of title for the car, and without the certificate of title, he could not transfer his ownership interest in it. He also claimed that the hold order resulted in him being stopped several times by different police departments. The Eighth Circuit, however, dismissed the plaintiff's complaint, holding that "the factual allegations of [the] complaint fail to support a sufficient causal connection between the alleged deprivations and the [police department's] actions." Morton, 793 F.2d at 188. The court noted that the Vehicle Examination Certificate expressly stated the police department's belief that the car was not stolen, and the Certificate was supposed to be forwarded to the Department of Revenue. The plaintiff had not alleged that the police department failed to forward the Certificate to the Department of Revenue, much less that it failed to do so intentionally, nor did he allege that the Certificate would not have given the Department of Revenue sufficient notice that the car was not stolen. Absent those allegations, the court was unwilling to presume them. Because there was no allegation that the police department had not forwarded the Certificate to the Department of Revenue, the court ruled that the issuance of the Certificate disrupted the causal connection between the police department's alleged conduct and the plaintiff's injuries. Id.
Although the court in Morton spoke of insufficient factual allegations, it did not say that the plaintiff's allegations were conclusory, or that they failed to give the defendant notice of the plaintiff's claims. In fact, the Court at least purported to apply the traditional standard when it said that the face of the plaintiff's complaint *980 presented an insuperable bar to recovery. Id. Based on the Court's reading of Morton, the Court disagrees that all civil rights plaintiffs were subjected to a heightened pleading standard in 1986. Three years later, however, in Brown v. Frey, 889 F.2d 159 (8th Cir.1989), the Eighth Circuit first mentioned a heightened pleading requirement. Quoting the United States Court of Appeals for the District of Columbia Circuit, the court declared that "damages actions against government officials are subject to a heightened standard of pleading with sufficient precision `to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds.'" Id. at 170 (quoting Hobson v. Wilson, 737 F.2d 1, 29 (D.C.Cir.1984)). In Brown, however, the Eighth Circuit did not discuss the standard, or apply it in a meaningful way.
A few years later, the United States Supreme Court cast doubt on the propriety of heightened pleading standards in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The case involved two separate incidents of police misconduct involving the execution of search warrants by a special drug task force. While driving in Fort Worth, Texas, police suddenly stopped and surrounded Charlene Leatherman and her family, and threatened to shoot them. The officers told them that other officials were searching their house. When the family returned home, they found both of their dogs dead, apparently shot by the police with a shotgun. In the second incident, police officers executed a search warrant on the home of Gerald Andert, but in the process they severely beat Andert without provocation. After the beating, the officers forced the family, who was mourning the death of another family member, to lie face down on the floor where the officers continued to insult and threaten them. It turned out that the police officers uncovered nothing illegal from either search. The plaintiffs in Leatherman sued several municipalities and other defendants in connection with these two incidents under § 1983, see Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), alleging a failure to adequately train officers in both the execution of search warrants and dog confrontation. The complaint stated no underlying facts other than the events described to support the assertion that the municipalities, customs, or practices condoned the officers' conduct. Three of the defendants moved to dismiss, arguing that the complaint did not adequately allege facts under the Fifth Circuit's heightened pleading standard. The district court granted the motion for all defendants, including those who had not filed a motion, and the Fifth Circuit affirmed. A unanimous Supreme Court reversed, noting that a heightened pleading requirement for municipal liability cases was "impossible to square" with the pleading standard in Fed. R.Civ.P. 8, as interpreted by Conley v. Gibson. Leatherman, 507 U.S. at 168, 113 S.Ct. 1160. In addition, the Court noted that Fed.R.Civ.P. 9(b) imposed a particularity requirement in fraud and mistake cases. Invoking the expressio unius est exlusio alterius canon of interpretation, and recognizing that § 1983 actions alleging municipal liability were not mentioned in the Federal Rules as requiring anything more than a short and plain statement, the Court rejected the heightened pleading standard for § 1983 actions against municipalities. Id. The Court noted, however, that it had "no occasion to consider whether . . . qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials." Id. at 166-67, 113 S.Ct. 1160.
The circuits have taken very different views on the extent that Leatherman applies *981 outside of Monell actions, and intracircuit conflict oftentimes makes it difficult to ascertain a particular circuit's position on the question. See Christopher M. Fairman, Heightened Pleading, 81 Tex. L.Rev. 551, 583 (2002). Professor F airman divides the circuits into three patterns: (1) those that ban heightened pleadings in all cases, (2) those that allow a heightened pleading standard in all but Monell actions, and (3) those that allow a heightened pleading only in cases where subjective intent is an element of the constitutional claim. Id. at 584. His position on the Eighth Circuit is equivocal. See id. at 585, n. 267 ("noting that the Eighth Circuit also appears to have retained heightened pleading"). In Edgington v. Missouri Department of Corrections, 52 F.3d 777, 779-80 (8th Cir.1995), the Eighth Circuit quoted Brown v. Frey, and reiterated that the heightened pleading requirement remained the law of the Eighth Circuit for § 1983 cases against government officials. In Edgington, a pro se prisoner brought a § 1983 suit premised on the Eighth Amendment, alleging that he had been refused treatment for his mental and AIDS-related illnesses. Upon a magistrate judge's recommendation, the district court ordered the plaintiff to file an amended complaint setting forth, beneath an underlined caption with each defendant's name, the specific rights allegedly violated by, and specific factual allegations supporting his claims against, each defendant. The district judge took this action because the magistrate found it difficult, based on the allegations in the complaint, to determine the nature of his claims and whether any of his claims were frivolous. The plaintiff filed an amended complaint as the district judge ordered, but the district court determined that the amended complaint did not comport with his order, and ordered him to file another complaint. The plaintiff failed to do so, and as a result, the judge dismissed his complaint. On appeal, the Eighth Circuit recognized that a liberal reading of Edgington's complaint revealed facts which, if proved, would support his claim that he was denied medical treatment. The court ruled, however, that the deficiency in his complaint stemmed from his failure to follow the district court's order to specifically plead how each of the defendants violated his rights. Id. The district court's order, the Eighth Circuit said, was consistent with the heightened standard of pleading required of complaints seeking damages from government officials, and Edgington simply did not comply with the order. Id. at 780.
While the court clearly affirmed the state of the heightened pleading standard in Edgington, the opinion did not provide a useful guide for allegations in a complaint that either would or would not meet the test. Indeed, the case turns more on the fact that the plaintiff violated a court order, than on the contours of the heightened pleading test. One may assume that if the Eighth Circuit found that the district judge had no authority to order the plaintiff to file an amended complaint, the result on appeal would have been a reversal based on an abuse of discretion. The magistrate recommended that the district judge dismiss the case because, in the magistrate's opinion, the plaintiff had not alleged specific facts. The Eighth Circuit reviewed the complaintfrom the opinion, one cannot tell whether the Eighth Circuit means the original complaint the plaintiff filed, or the amended complaint the judge ordered him to fileand actually found that he had pleaded enough facts to put the defendant on notice of his claims. The problem, in the Eighth Circuit's opinion, was that, despite the district judge's order, the plaintiff had not made it clear how each defendant related to his allegations. Id. at 779-80. This is not really a heightened pleading problem, in the sense of the *982 sufficiency of facts pleaded, but a problem of clarity. Cf. Frey v. City of Herculaneum, 44 F.3d 667, 671-72 (8th Cir.1995) (recognizing that Leatherman eliminated the heightened specificity requirement for § 1983 cases against municipalities, but nonetheless affirming the trial court's dismissal of the plaintiffs' multi-count, multi-party complaint under the liberal notice pleading standard because the complaint gave no indication of how the various defendants were involved).
In Harris v. St. Louis Police Dep't, 164 F.3d 1085 (8th Cir.1998), the Eighth Circuit eschewed a strict adherence to a heightened pleading standard. There, the plaintiff was walking down the street with a beer in his hand when two police officers stopped him. The plaintiff alleged that a third officer, who had been called as a back-up, threatened to mace, shoot, or beat the plaintiff if he did not confess to a felony. He further alleged that the officer "brushed up against" him, "used physical force," and cut up his bus pass after pulling a knife on him. The plaintiff stated that he felt his life was in danger when the officer threatened him with "lethal deadly weapons." The trial court dismissed the plaintiffs complaint on the defendants' Fed.R.Civ.P. 12(b)(6) motion, but the Eighth Circuit reversed, holding that the plaintiff's allegations were sufficient to call into question whether the officer's conduct during his arrest and search of Harris was objectively reasonable under the circumstances. Id. at 1087. What's more, the court cited Leatherman for the broad proposition that under the Federal Rules of Civil Procedure, there are no heightened pleading standards for § 1983 claims, without mentioning that the Leatherman Court specifically reserved decision on whether heightened pleading standards for § 1983 claims against government officials were appropriate. Id. at 1086-87.
Just last term, in Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court seemed to have closed the door on the propriety of heightened pleading standards[5] when it invalidated the Second Circuit's *983 requirement that employment discrimination plaintiffs plead a prima facie case of discrimination in their complaint to survive a motion to dismiss. The Court again emphasized that the heightened pleading requirement conflicted with Fed. R.Civ.P. 8's simple pleading standard, which applies to all civil actions, with limited exceptions, such as Fed. R. 9(b)'s requirement that fraud be pleaded with particularity. Id. at 513, 122 S.Ct. 992. More importantly, the Court noted that it had declined to extend the exceptions to other contexts. Just as Rule 9(b) did not mention 42 U.S.C. § 1983 suits alleging municipal liability, the Court said, neither did it refer to employment discrimination. Id. Thus, employment discrimination complaints, "as in most others," had to merely satisfy the simple requirements of Rule 8(a).
This Court believes that the Supreme Court could not be clearer in declaring that, subject to very narrow circumstances, a § 1983 plaintiff need only set forth a short and plain statement of her claim. By definition, then, she need not plead it with particularity. She does, however, have to clearly delineate who she is suing, and for what cause of action, and there must be some factual context in the complaint to allow a court to rule on a qualified immunity defense, should a defendant choose to interpose it. The corollary to this is that a plaintiff must include enough information in her complaint for a government official to meaningfully assert the defense. A § 1983 plaintiff may not avoid a qualified immunity ruling and get limited discovery by not alleging any facts at all, and hiding behind the liberal notice pleading requirements. The Court does not, however, view § 1983 cases against government officials as presenting a factpleading or heightened pleading requirement, because it is possible to have a short and plain statement of the claim that allows a government official to interpose the qualified immunity defense and for a court to effectively rule on it. This is merely the notice-pleading standard in a different context. As long as the plaintiff is clear in describing who the parties are, a brief context, and the rights the plaintiff claims were violated, the court should be able to decide whetheron the face of the complaint and without considering evidence beyond the pleadingsthe plaintiff states a violation of a constitutional right, and whether that right was clearly established in that context. If it is unable to do so, a court should have the authority, either by granting a motion for more definite statement or a motion to dismiss, to order the plaintiff to amend her complaint to make her claims more clear.
To be sure, the plaintiffs' Third Amended Complaint is neither short nor plain. For example, it rambles on for roughly six pages and 38 paragraphs making generalized legal conclusions before it mentions how the parties in this case relate to each *984 other. In paragraph 71 and its subparts and paragraph 99, the plaintiffs do list the defendants and their allegations against those defendants. Sometimes those allegations are clear, and at other times they are confusing. Nevertheless, the Court will not now order the entire Third Amended Complaint dismissed, but will delineate its understanding of the plaintiffs' allegations against each defendant that meet the Court's understanding of the pleading requirements, and make a ruling in the next section on whether these defendants are entitled to immunity on the face of the allegations contained in paragraphs 71 and 99.
Of the original 21 motion-to-dismiss defendants, 18 were employees of DFS for the State of Missouri at the relevant time period: Lynne Gierer, Tamee Bruenderman, Catherine Boone, Jae Anne Carder, Meredith Thibault, Pam Menefee, Page Rowbottom, Ladonna Seegmiller, Julie Lindemann, Deborah Crocker, Denise Hughes, Linda Russell, Connie Juengel, Edna Phillips, Cheryl O'Brien, Sheila Hedgecorth, Susan Elrod, and Donna Volner. Third Amended Complaint ¶ 67. The remaining threeGerald Poepsel, Kathy Anderson, and Patricia Bruns worked for the Juvenile Office in Franklin County, Missouri. Marie Clark, who recently answered the complaint and filed a motion to dismiss, was a counselor. The Court construes the plaintiffs' Third Amended Complaint as alleging the following violations against the various motion-to-dismiss defendants that pass, however barely, the pleading requirements.
(a) Lynne Gierer
Plaintiffs allege that Gierer wrongfully approved the removal of the Schatz children and stated, throughout the removal proceedings, that DFS did not want to spend any more money on the Schatz family because it would not help matters. They also claim that Gierer threatened to remove the Schatz children from the family home. Third Amended Complaint ¶ 71a.
(b) Tamee Bruenderman
In paragraph 71b, the plaintiffs outlined a laundry list of allegations against Tamee Bruenderman, some of which are too conclusory to go forward.[6] In order, the discernible allegations are that she:
 wrote a psychiatrist to check on sexual abuse even though there was no abuse;
 induced the childrens' foster mother to make unjustified hot line calls;
 made an unsubstantiated hot line call herself;
 tried to coach Timothy Schatz into making a sexual abuse allegation;
 directed Fee-Fi-Fo-Fun Day Care to make strip searches and constant inquiries of children, and had the center make unsubstantiated phone calls;
 told the childrens' mother, in the presence of the children, that she should leave their father;
 allowed the children to watch an Rrated movie;
 exaggerated and lied to a court by making the child abuse allegations sound worse than they were;
 used cursing language toward the plaintiffs;
 allowed the Schatz children to be in an environment where they used drugs *985 and alcohol, where sex was allowed, and curfew was not abided;
 placed Rebekah and Charity Schatz in foster homes where there were known drug problems;
 somehow interfered with a counselor that the Schatzes sought out;
 placed Timothy Schatz in a foster home where he was later sexually abused (despite an ongoing investigation of that home for abuse), and making it look like his father was responsible;
 being responsible for children telling their parents they had "Tamee Power" and that they were not required to follow their parents' orders;
 falsely wrote that Sarah Schatz's father sexually abused her;
 generally making false sexual abuse allegations; and
 telling the Schatz girls that sitting on their father's lap was sexual abuse
Id. ¶ 71b.
(c) Catherine Boone
According to the plaintiffs, Boone wrongfully removed the Schatz children from the home, and manipulated investigations and lied to get children evaluated by DFS counselors. The the Schatz family makes similar allegations against the other defendants and basically characterize as a lie or manipulation any government official's determination that did not go their way. The plaintiffs do not say how Boone or others lied, nor do they delineate what type of manipulations were involved. Id. ¶ 71c.
(d) Jae Ann Carder
Plaintiffs claim that Carder recommended that Jonathan and Deborah Schatz should not be returned to their parents despite the recommendation of a psychiatrist. They also claim that Carder acted contrary to the parents' wishes by allowing Charity Schatz to share an apartment with a man, and by placing her in a foster home where she (Carder) knew that people were having sex. Id. ¶ 71d.
(e) Meredith Thibault
The complaint alleges that Thibault wrongfully removed the Schatz children and made erroneous conclusions in certain reports she made about the Schatz parents abusing the children. The plaintiffs also accuse Thibault of coaching Timothy Schatz to make false statements regarding sexual abuse. Id. ¶ 71e.
(f) Pam Menefee
Plaintiffs accuse Menefee of improperly removing the children and making erroneous conclusions in reports she wrote about abuse and neglect in the Schatz household. Id. ¶ 71f.
(g) Paige Rowbottom
According to plaintiffs, Rowbottom wrongfully removed the children, came into the Schatz home, passed out business cards, and stated that spanking was against the law and that the children should call DFS if their parents spanked them. Id. ¶ 71h.
(h) Ladonna Seegmiller
Plaintiffs allege that Seegmiller improperly "hot lined" the Schatz parents without substantiation; laughed at the Schatz parents in front of their children; decided to remove the Schatz children from the home without cause; filed a false report against the Schatz parents; and told the Schatz children that they could make their own decisions. Id. ¶ 71y.
(i) Julie Lindemann
Plaintiffs accuse Lindemann of improperly removing two Schatz girls without evidence, allowing the children to smoke *986 against their parents' wishes; giving David Schatz chocolate despite knowing about his allergies; not recommending the counselors the Schatz parents chose; denying the Schatz parents contact with their children and allowing the children to be in an environment where sex, alcohol, and drugs abounded. Id. ¶ 71z.
(j) Deborah Crocker
Plaintiffs allege that Deborah Crocker improperly had Timothy and Abigail Schatz strip searched and reported abuse where there was none. Id. ¶ 71aa.
(k) Denise Hughes
According to plaintiffs, Hughes improperly recommended that all the Schatz children be removed, threatened to remove them numerous times, and pointed her finger in Andy Schatz's face, admonishing him to raise the children the way DFS told him with a threat to have the children removed and adopted. Id. ¶ 71bb.
(l) Linda Russell
Plaintiffs accuse Russell of improperly removing the children and ignoring the complaints the Schatz parents filed regarding abuse and neglect of the children while in foster care. Id. ¶ 71cc.
(m) Connie Juengel
The plaintiffs' cause for quarrel with Juengel is that she made foster home placements that differed from the recommendations of a psychiatrist, knowing that the children would be at risk of abuse in the foster homes. Id. ¶ 71dd.
(n) Edna Phillips, Cheryl O'Brien, Sheila Hedgecorth, Susan Elrod, and Donna Volner
Plaintiffs allege that these defendants placed David and Abigail Schatz in a foster home where other children were removed because of neglect.[7]Id. ¶¶ ff-jj, at 19.
(o) Gerald Poepsel, Kathy Anderson, and Patricia Bruns
According to plaintiffs, these defendants knew that the removal proceedings of the Schatz children violated due process of law, but nonetheless proceeded against the Schatz parents without substantiating the allegations. The plaintiffs allege further that Poepsel filed false petitions against the parents, and that Anderson covered up a claim of abuse. Id. ¶¶ kk-mm, at 19.
(p) Marie Clark
Finally, plaintiffs allege that Marie Clark reported that Deborah Schatz had been sexually abused despite the fact that Deborah denied it, and reported that Angel Schatz had been abused after only one evaluation. Id. ¶ 71p.
(q) Paragraph 99
In paragraph 99, the plaintiffs make an overarching allegation against 16 of the remaining defendants, 13 of whom are motion-to-dismiss defendants, and 3 of whom have moved for summary judgment. According to the plaintiffs, Defendants Gierer, Bruenderman, Boone, Carder, Thibault, Menefee, Rowbottom, Seegmiller, Lindemann, Crocker, Hughes, Russell, Juengel, along with Defendants Cheryl Savage, Joanne Gratzer and Stephanie Light:

*987 [E]ntered upon a course of action to make hotline calls which were false and misleading and to otherwise build a false and misleading case when there was never any evidence of abuse or neglect by the Plaintiff parents and there was never any corroboration of any of the tips received as a result of hot line calls or tips. Further, there was no reasonable suspicion or probable cause of any child abuse and any reasonable investigation and procedure undertaken by the Defendants would have borne out such fact.
Third Amended Complaint ¶ 99.
(2) Qualified immunity
In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. 2727. The Court recently explained that courts should undertake a two-part inquiry to determine whether an official is entitled to qualified immunity. The first question is whether the plaintiffs allegations, if true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. Saucier, 533 U.S. at 201, 121 S.Ct. 2151; Lockridge v. Board of Trustees of the University of Arkansas, 315 F.3d 1005, 1008 (8th Cir.2003). On the other hand, if a violation could be made on a favorable view of the parties' submissions, the next step is to ask whether the right was clearly established at the time of the official's conduct. Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
Under section IV of the Court's September 2002 order on page 17, the Court discussed qualified immunity with respect to the 5 summary judgment defendants the Court had before it. The Court applied the qualified immunity standard to those defendants, concluding that the plaintiffs' complaints regarding their actions did not rise to the level of a constitutional violation. September 2002 order at 22. The Court did not, however, address the motion-to-dismiss defendants' qualified immunity defense, stating only that under the standard applied to motions to dismiss in general, the Court had to deny the defendants' motions. The Court said this was so because the plaintiffs might have had proof to support their claims. This was error. Once the motion-to-dismiss defendants asserted the qualified immunity defense, the Court was obligated to address it, and ask whether qualified immunity was present on the face of the Third Amended Complaint. Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir.1996). Thus, if it is clear from the Third Amended Complaint that the plaintiffs' allegations do not amount to constitutional violations, or even if they do, the rights at issue were not clearly established, the Court must grant the motions to dismiss on qualified immunity grounds. Once the Court decided that the plaintiffs had alleged enough in the Third Amended Complaint to go forward, it should have then decided the qualified immunity issue. The Court erred when it failed to do so in its September 2002 order, and now makes a clear ruling on the point.
(a) Rulings
Many of the claims asserted against these defendants are factually similar to other claims parents have made *988 against child abuse investigators for violating the parents' liberty interest in the care and custody of their children. The Supreme Court has recognized that the relationship of love and duty in a recognized family unit is a liberty interest entitled to constitutional protection, and that both parents and children have a liberty interest in the care and companionship of each other. See Lehr v. Robertson, 463 U.S. 248, 258, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Moreover, the Eighth Circuit has observed that parents have a fundamental liberty interest in the care, custody, and management of their children. Fitzgerald v. Williamson, 787 F.2d 403, 407 (8th Cir. 1986). The liberty interest in familial relations is limited, however, by the compelling governmental interest in protecting minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves. Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987). The right to family integrity does not include the right to be free from child abuse investigations. Manzano v. South Dakota Dep't of Social Servs., 60 F.3d 505, 510 (8th Cir.1995) (quoting Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993)). The courts have thus recognized that the need to constantly balance the interests of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome, and the requirement that the right be clearly established at the time of the alleged violation is particularly formidable. Manzano, 60 F.3d at 510.
In the overwhelming majority of the child abuse investigation cases, the courts have held that the state actor investigating child abuse was entitled to qualified immunity. See, e.g., Thomason v. SCAN Volunteer Serv., Inc., 85 F.3d 1365 (8th Cir. 1996); Manzano v. South Dakota Dep't of Soc. Servs., 60 F.3d 505 (8th Cir.1995); Lux by Lux v. Hansen, 886 F.2d 1064 (8th Cir.1989); Myers v. Morris, 810 F.2d 1437 (8th Cir.1987). In Manzano, the Eighth Circuit held that "when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." Manzano, 60 F.3d at 509-11.
It is also important to note that the plaintiffs' only colorable § 1983 claims are based upon the substantive component of the Due Process Clause of the Fourteenth Amendment. A state actor substantively violates the Due Process clause only when the action can properly be characterized as arbitrary, or conscience shocking in a constitutional sense. County of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The Supreme Court has cautioned that the Due Process clause does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. Id. at 848, 118 S.Ct. 1708. In Lewis, the Court described the spectrum of conduct that can give rise to different types of liability and reasoned that constitutional liability requires egregious conduct on the part of a government official. Id. Negligence is categorically beneath the threshold of constitutional due process. Id. at 848-49, 118 S.Ct. 1708. Rather, an official's actions must generally intended to inflict harm to be conscience-shocking in the constitutional sense. Hawkins v. Holloway, 316 F.3d 777, 785 (8th Cir.2003).
The plaintiffs' main complaints against the motion-to-dismiss defendants is that they either wrongfully approved or argued against the removal of the Schatz children, made erroneous conclusions, somehow manipulated investigations, or made threats to remove the children. The plaintiffs also accuse several defendants of *989 not following the parents' instructions on raising the children. These allegations do not amount to violations of the substantive component of the Due Process clause. For one thing, these defendants are absolutely immune from § 1983 liability to the extent they participated in the proceedings in state court that led to the State's removal of the Schatz children because their role would be functionally comparable to that of a prosecutor. See Thomason v. SCAN Volunteer Services, Inc., 85 F.3d 1365, 1373 (8th Cir.1996). Absolute immunity also protects any defendant's role as a witness in state court, see Manzano v. Dep't of Social Servs., 60 F.3d 505, 512 (8th Cir.1995), and any defendant who gave a report or recommendation to the juvenile court, see Myers v. Morris, 810 F.2d 1437, 1466 (8th Cir.1987), abrogated in part on other grounds by Burns v. Reed, 500 U.S. 478, 111 S.Ct. 1934, 114 L.E d.2d 547 (1991).
What's more, when the plaintiffs plead that certain defendants wrongfully removed the children, they are, in reality, claiming that they disagreed with the defendants' conclusions about whether the Schatz parents abused their children. They have, however, pointed to no law that was clearly established in the early 1990's that would have put the defendants on notice that they would have had to answer for their conclusions on child abuse in a § 1983 suit. It is not enough to say that the defendants' conclusions were wrongful. Any set of parents suffering a defeat in family court would believe that the removal of their children was wrongful. The Court finds no case law from the relevant time period, however, that would suggest that defendants investigating child abuse would be subject to § 1983 liability by making a conclusion that was wrong, or even targeting the plaintiffs. Indeed, one of the only relevant cases from the period suggests that the parental liberty interest in keeping the family unit intact in the context of reasonable suspicion that parents might be abusing children was not a clearly established right. Myers v. Morris, 810 F.2d at 1463.
Plaintiffs cite Whisman v. Rinehart, 119 F.3d 1303 (8th Cir.1997) to support their case. In that case, Michelle Whisman left her sixteen month old son with a babysitter one evening. The next morning, the babysitter called DFS, spoke with a social worker, and reported that Michelle had not picked her son up as she agreed and that Michelle's boyfriend told the babysitter that Michelle was at home "passed out drunk." A juvenile officer called the police, who went to Michelle's home, but failed to make contact with her. The social worker then went to the babysitter's home and ordered the babysitter to turn the baby over to the custody of the juvenile officer. The social worker made this decision even though the boy was in good health and Michelle's mother had agreed to pick the baby up. The court rejected the investigators' motion to dismiss based upon qualified immunity. The court did not believe that it was presented with a situation where it was forced to balance the rights of protecting the children against the mother's liberty interest because the defendants knew there was no indication of physical neglect, no immediate threat to the baby's welfare and no indication of criminal activity on the mother's part. In short, there was no reasonable suspicion of child abuse presented by the allegations of the complaint. The court also concluded that no investigation was done to determine whether it was necessary or even advisable to take the child into protective custody. Id. at 1310. The case turned on the total failure by the state investigator to conduct any meaningful investigation at all. See Omni Behavioral Health v. Miller, 285 F.3d 646, 654 (8th Cir., 2002) (discussing Whisman).
*990 The plaintiffs' reliance on Whisman is unavailing, first because it is a 1997 case, and can not be said to constitute clearly established law in 1990 and 1992, the time period of the plaintiffs' allegations. Second, there can be no question that the defendants here did perform an investigation and had evidence that the children were being abused. The overall record in this case is replete with reports of accusations by the children that they were being abused. In short, even if the plaintiffs' could be said to have stated a violation of their constitutional rights, the Court finds that the defendants are entitled to qualified immunity because the right was not clearly established in the context of child abuse investigations in 1990 or 1992. This disposes of all allegations of the motion to dismiss defendants except Marie Clark, Deborah Crocker, and the claims against Tamee Bruenderman regarding her alleged order of a strip search.
Marie Clark is entitled to qualified immunity because the allegations against her question her conclusions as a counselor, and the Court ruled in its both of its previous orders that the recommendations of counselors, who had no authority concerning the childrens' placement, do not amount to constitutional violations, even if their conclusions are erroneous. See also Section C(2) infra.
While the plaintiffs accuse Deborah Crocker and Tamee Bruenderman of being involved in strip-searching the children, they provided reports in responding to the motion for summary judgment submitted by defendants Fee-Fi-Fo-Fun Day Care, Stephanie Light, and Joanne Gratzer that shed more light on their allegations. Those records establish that Crocker and Bruenderman were present when a juvenile officer asked to see Timothy Schatz's bottom after he accused his father of spanking him. The defendants' actions in this regard do not shock the conscience of the Court. The Eighth Circuit has also recognized that not every inappropriate or unwanted touching by a public official, even if accompanied by vulgar comments of a sexual nature, can amount to the "brutal and inhumane abuse of official power" necessary to demonstrate a violation of an individual's bodily integrity sufficient to support a constitutional violation. Hawkins, 316 F.3d at 785; see also Reeve v. Oliver, 41 F.3d 381, 382-83 (8th Cir. 1994) (no due process violation when state actor touched and rubbed a woman's back while staring at her chest). Here, the defendants did not touch Timothy inappropriately, but were reasonable in asking him to see his bottom to ascertain if he had bruises.
The court also dismisses the plaintiffs' claims of conspiracy. Conclusory and unsupported allegations of conspiratorial purpose fail to defeat an assertion of qualified immunity, even at the motion-to-dismiss stage. See Myers v. Morris, 810 F.2d 1437, 1453 (8th Cir.1987). The plaintiffs have not come forward with allegations pleaded with sufficient specificity and factual support to suggest a "meeting of the minds" like the Eighth Circuit has required. See Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir.1985).
In sum, the Court finds that all of the motion-to-dismiss defendants are entitled to qualified immunity.
C. Claims against the summary judgment defendants
(1) The defendants
(a) Monica Houttuin
Plaintiffs allege that Houttuin made false statements to keep the Schatz children from returning home, made false recommendations about the children, and told Andy Schatz, in front of the children, that he should confess to all of the things he *991 did to them. Third Amended Complaint ¶ 71i.
Houttuin is a licensed clinical social worker, who visited with Charity Schatz from December 8, 1993 through March 21, 1996. Charity was returned to her parents' care shortly before her first visit with Charity. DFS contracted with Houttuin to help Charity adjust to her environment at the Schatz household. As part of the adjustment process, Houttuin conducted therapy sessions with Charity and her parents. Shortly after Charity's first visit, she was returned to foster care because her mother had been hospitalized for psychiatric reasons, and she was not supposed to be in the sole care of her father. Houttuin had no involvement in Charity's return to foster care. For the next two to three years, Houttuin counseled Charity sporadically as Charity readjusted to life in a foster home. In addition to Charity, Houttuin counseled Abigail for roughly three months in 1994 when DFS became concerned about behavioral problems Abigail exhibited while living with her foster parents. Houttuin also visited with David Schatz for three months in 1994 to help him adjust to his foster placements.
There is no evidence in the record to show that Houttuin's role was anything other than a therapist. She never testified in court as a witness, she never made any findings of abuse, and she never told anyone from DFS that she thought any of the Schatz children were abused.
(b) Dina Vitoux
According to plaintiffs, Vitoux improperly reported abuse, improperly recommended that the children be removed, and accused Andy Schatz of abuse without evidence. They claim that she also pressed Timothy Schatz into making abuse allegations against his father when it actually occurred in foster care. Third Amended Complaint ¶ 71j.
Vitoux is also a licensed clinical social worker who DFS hired to counsel five of the Schatz children, namely Angel, Rebekah, Deborah, Sarah, and Timothy. She did advise DFS of her opinion that Timothy Schatz had been sexually abused, and that it would be in Timothy's best interests to remain in foster care for a period of time. She made no other recommendations to DFS concerning any of the Schatz children.
Vitoux's notes of her counseling sessions with Timothy reflect that he made several statements in the therapy session about sexual abuse. After Timothy mentioned that his sister Sarah had touched him in an inappropriate places, Vitoux asked Timothy if anyone ever wanted him to touch them, and he said "Popa pinched my peeper." At another counseling session, Timothy drew Vitoux a picture in an effort to talk about secret touching. According to Vitoux's notes, he drew a penis and stated that it had to be big because his "popa has a big peeper." Timothy then drew a baby underneath the penis, stating that the baby was "sucking Daddy's peeper," and that it was "really big."
A week later, Timothy arranged a doll house at his counseling session to represent his dad's bedroom and bathroom. When Vitoux gave Timothy a boy doll and a man doll and indicated that the former represented Timothy and the latter signified his father, Timothy brought the father over to the bathtub and said "Dad sucked his peeper." He then pulled the man doll's pants down and said, "the boy kissed the Dad's butt," and that it tasted good.
Vitoux's notes reflect that Timothy was troubled by the discussion of his abuse; he would tell her that he was tired of talking about it, and that he had disclosed his abuse to too many people. At one point, Timothy asked Vitoux if he would have to continue talking about it if he said it didn't *992 happened. He then said that he made it up and that it didn't happen. At the end of her June 1992 report, Vitoux noted that Timothy was a "very scared and angry little boy," and that the themes of his play indicated that he had been sexually, physically, and emotionally abused. She also believed that the themes of Timothy's play were typical of a child who is a victim of ritualistic abuse.
Even though Timothy had recanted his story at his June 2 meeting with Vitoux, he told Vitoux on June 30 that he was glad Vitoux believed his story because he didn't have to think about the "secret touching" as much. This equivocation continued throughout Timothy's counseling sessions. When Vitoux asked Timothy directly if his father abused him, Timothy would say that he made his story up. He continued, however, to make several statements that indicated the abuse occurred and that he was afraid to discuss it further. In a January 28, 1993 session, Timothy said that he lied about his original accusations. When Vitoux pressed him about his definition of a lie, Timothy said that a lie "is when you tell on someone and they get in trouble."
Based upon her observations, Vitoux recommended in her September 1992 report that Timmy not be returned to his natural home. In her opinion, it would have been detrimental to Timothy because his father denied the abuse.
(c) Judith Schechtman
Plaintiffs accuse Schechtman of making wrongful conclusions that Sarah and Abigail Schatz had been abused, and wrongfully accused the Schatz parents of abuse after one evaluation. Third Amended Complaint ¶ 71k.
Schectman is a licensed clinical social worker whom Tamee Bruenderman from DFS approached about evaluating Sarah Schatz for ritualistic abuse. Bruenderman asked for her opinion on whether Schectman was sexually abused, and if so, a recommendation for her treatment. DFS asked for Schechtman to perform the same services for Abigail Schatz.
Schectman's notes contain many direct quotes from Sarah that discussed ritualistic and sexual abuse. While unable to draw a firm conclusion, Schechtman wrote in a 1991 report, after meeting with Sarah on a regular basis for two months, that Sarah exhibited characteristics consistent with children who had been ritualistically abused. Schectman also thought it was likely that Sarah was traumatized by abuse at the hands of her parents.
In her report on Abigail, Schectman noted that while Abigail denied sexual abuse and minimized physical abuse, it seemed likely that Abigail might not have been forthright about her experiences. In her opinion, although difficult to measure the severity, Abigail exhibited symptoms consistent with children who had experienced neglect and emotional or physical abuse.
(d) Robert Schnidman
According to plaintiffs, Schnidman wrongfully recommended that the children not be returned to the Schatz parents due to abuse after seeing Charity and Rebekah Schatz only once. Third Amended Complaint ¶ 71l.
In 1992, Tamee Bruenderman of DFS contacted Schnidman, a Ph.D in clinical psychology, and asked him to perform a psychological evaluation of both Charity and Rebekah Schatz. He provided a diagnostic impression of their psychological condition, and recommended a course of action based upon that impression. At the time he saw girls, they had already been placed in foster care. While Bruenderman informed Schnidman that she was concerned that Charity may have been sexually or emotionally abused, and that Mr. Schatz had destroyed some of the childrens' *993 items on purpose in reaction to feeling upset, Bruenderman never asked him to form a particular conclusion.
Using information from his psychological tests, as well ask background from Bruenderman and the childrens' foster parents, Schnidman found that each girl's condition was consistent with a young person who had been emotionally and (in the case of Becky possibly) physically abused. Based upon that finding, Schnidman recommended that if the girls were returned home, DFS should maintain an open case on the family.
(e) James Powers
The plaintiffs allege that Powers wrongfully concluded that Rebekah Schatz should be removed from the home and testified at a hearing where the Court disagreed with him. They also accuse Powers of wrongfully stating that Andy Schatz was involved in cults, and wrongfully concluded that David Schatz was abused and that Joy Schatz should remain in foster care. Third Amended Complaint ¶ 71n.
Powers is a Certified Health Care Provider with a Ph.D in psychology. Catherine Boone of DFS contacted him in 1993 to perform a psychological evaluation of Joy, Rebekah, and Rachel Schatz. This was designed to assist in the diagnostic and treatment planning process. After examining Joy and performing numerous tests, Powers wrote that he did not recommend that Joy return to her parents' home, because it was essential that improvement occur in her relationship with her father before reunification could occur.
Powers found no psychological evidence that Rachel had been subjected to physical, emotional, or psychological abuse, and saw no reason to continue her placement in foster care. Concerning Rebekah, he only recommended that she continue to receive counseling.
Powers does not remember evaluating David Schatz. Nor does he remember testifying at any judicial proceeding.
(f) Vicki Simmons
Plaintiffs accuse Simmons of wrongfully concluding that Sarah Schatz had been emotionally, sexually, and ritualistically abused. Third Amended Complaint ¶ 71r. Simmons is a licensed professional counselor, and at the times related in the Third Amended Complaint, was working for Therapeutic Intervention, Inc. (Therapeutic). Therapeutic contracted with DFS in January 1991 to provide counseling to Sarah Schatz to assist her in adjusting to life in a foster home. From January 22, 1991 through September 11, 1991, Simmons counseled Sarahwho had already been placed in a foster homeon roughly 22 occasions. Simmons provided three reports to DFS that concern her meetings with Sarah: an initial progress report, a quarterly report, and a 60-day report. Nowhere in the reports is there any statement from Simmons setting forth an opinion that Sarah had been abused. The reports contain mostly direct quotes from Sarah. Some of those reference abuse. The reports do indicate that Simmons explored the possibility that Sarah had been abused, but Simmons never made a written conclusion that Sarah was abused. Simmons also had no power to decide on Sarah's removal, or her ultimate stay in foster care.
(g) Marsha Roy
Plaintiffs accuse Roy of exaggerating, apparently in Court, about the conditions in the Schatz household. They also claim that Roy taunted the Schatz parents about their religious beliefs and stated to the children that the parents should not be in control.[8] Third Amended Complaint ¶ 71u. *994 Roy was a parent aid, contracted to work for DFS, and in 1990, she was assigned to work with the Schatz parents. She last visited with them in March 1992. The goal of a parent aid is to work with the parents to assist them in providing a better environment for their children, as well as to make observations and report her recommendations to DFS. It is undisputed that she had no power to remove any child from a family.
(h) Cheryl Savage
According to the plaintiffs, Savage improperly hot lined the Schatzes without evidence, improperly reported physical and emotional abuse, and stated that if the Schatz children were placed back in the home, "they" would find a reason to place the children back with DFS. They also claim that Savage improperly recommended, after only one meeting, that Jonathan and Deborah Schatz not return home. Third Amended Complaint ¶ 71v.
Savage is a licensed clinical social worker, and was hired by the Missouri Division of Medical Services (note that neither the Juvenile Court nor DFS made the agreement) in July 1996 to provide counseling services to Jonathan and Deborah Schatz, who were then living in the same foster home in Gerald, Missouri. She counseled Jonathan and Deborah in individual sessions for roughly five months (from August through December 1996). Savage provided no information directly to the Juvenile Court or DFS, although her records were subpoenaed on one occasion. She had no involvement in the decision to keep the Schatz children in foster care, and she never had any meeting with any other defendant other than Joanne Carder, Jonathan and Deborah's legal custodian, to report that the children were attending their counseling sessions.
Savage made one hotline call to DFS concerning child abuse, but states that Jonathan and Deborah complained to her that their father was abusing one of their younger siblings. Simmons claims that as a social worker, she had a state statutory duty to make the report. See Mo.Rev. Stat. § 210.115
(i) Joseph Long
Plaintiffs accuse Long of wrongfully concluding, after only one evaluation, that Angel Schatz was abused. Third Amended Complaint ¶ 71w.
Long is a licensed Ph.D in clinical psychology who contracted with DFS in 1990 to perform a psychological evaluation of Angel Schatz. He interviewed her, and gave her a Projective Personality Test. After the interview, Long found that there were enough indicators to support a finding of emotional abuse and neglect in the family environment, and that there might have been evidence to substantiate physical abuse in the past. At the conclusion of his report, Long merely recommended that the Schatz family setting be monitored, and that Angel be given the opportunity to seek counseling.
(j) Timothy Jones
Plaintiffs allege that Jones improperly recommended, without substantiation, that Jonathan Schatz should remain in foster care. Third Amended Complaint ¶ 71x. After Jonathan Schatz had been placed in foster care, DFS contracted with Jones, a licensed professional counselor and clinical social worker, to provide Jonathan with psychological counseling. Jones met with Jonathan from June 22, 1993 through August 3, 1994. During that time, Jones attended a placement review meeting at the offices of DFS, where he provided a *995 progress report on his consultation with Jonathan. Jones, however, was never asked his opinion on whether Jonathan should be returned to the Schatz household or on his (Jonathan's) foster care placement. His sole purpose was to assist Jonathan in adjusting to life in a foster home environment.
(k) Ozark Youth Residential Services, Mark Owings, and Woody Friel
Plaintiffs allege that these defendants wrongfully held Rebekah Schatz against her wishes at the facility without any court order. Third Amended Complaint ¶¶ 71nn-pp, at 20. On December 1, 1992, the Circuit Court of Franklin County ordered that Rebekah Schatz be removed from the Schatz home and granted legal and physical custody of Rebekah to DFS. DFS removed Rebekah a second time in December 1994. On January 23, 1995, Ozark Youth Residential Services (Ozark) received a letter from DFS-who at that time was Rebekah's legal custodian-authorizing Rebekah's residential treatment. On that same date, Ozark notified DFS that they were willing to house Rebekah. Rebekah remained in Ozark's care until she was discharged on July 7, 1995. Mark Owings and Woody Friel were Ozark employees during Rebekah's residency.
(l) Fee-Fi-Fo-Fun Day Care, Joanne Gratzer, and Stephanie Light
Plaintiffs assert that these defendants improperly strip searched and interrogated and questioned Timothy and Abigail Schatz and made improper hot line calls concerning those children. Third Amended Complaint ¶¶ 71 uu-ww, at 20. In 1992 a DFS representative approached Joanne Gratzer, the co-owner and co-operator of Fe-Fi-Fo-Fun Day Care (Day Care), and asked her if she had an opening to provide day care services for Timothy and Abigail Schatz. She did, and the children were enrolled in the Day Care for approximately six months. By this time, Abigail and Timothy had been returned to their parents' custody.
On February 18, 1992, Mrs. Schatz brought Abigail and Timothy to the Day Care and she (Mrs. Schatz) had a big black eye. According to DFS records, when Gratzer asked Timothy what happened to his mother, he said, after hesitating at first, "My father hit her, he hit me too." The record is unclear on this point, but somehow, it became known that Timothy had bruises on his bottom-it is not clear from the record whether Day Care workers mentioned the bruises on Timothy's bottom in the hot line call. Later that afternoon, Tamee Bruenderman and Deborah Crocker from DFS and Maxine Pracht from the Franklin County, Missouri Sheriff s Office interviewed Timothy and Abigail. Timothy told them that his father had spanked him real hard on his bottom. The investigators observed that Timothy had a bruise on his arm below the elbow and round bruise on the lower portion of his back, about one-half inch in diameter. First, Timothy claimed he got the bruise from his bed, then he said that he fell from his bike, records state that the bruises were faint and difficult to see. After Timothy stated that his father had spanked him, Bruenderman asked him if he had any bruises on his bottom, and he said he did. He said he got them from his father pinching his butt. Pracht then asked Timothy if he could see if he (Timothy) had any bruises on his butt. Timothy said yes, and Pracht reports that he had no bruises on his butt. A DFS report, however, states that Timothy's bruises were very small, faint, and difficult to see.
After interviewing Timothy, the investigators spoke to Stephanie Light, a Day Care employee. She recounted the story about Timothy's mother having a black eye when she brought him to the Day Care. *996 She told investigators that she asked Timothy how his mother got her black eye, and Timothy told her his father did it. When Light asked Timothy if his father hit him and Abigail, Timothy said yes. Shortly after that conversation, one of Abigail's teachers notified Light that Abigail had a large bite mark on her arm. Light then took Timothy aside and asked him if he had bitten Abigail. At first he said that his sister Deborah bit Abigail, but later said his father did it.
On March 16, 1992, an unknown Day Care employee called Bruenderman and informed her that Timothy and Abigail had head lice. DFS records also show that a Day Care employee-the plaintiffs claim it was Stephanie Light-telephoned the DFS abuse hotline on Aril 28, 1992 to report that Timothy had accused his father of forcing him to have oral sex with him, urinating on him, forcing him to drink it, and forcing him to smell his butt. Timothy had bruises all over his chest, and allegedly said that his father hit him.
(2) Rulings
The Court finds that the summary judgment defendants are entitled to qualified immunity because their alleged actions, even if true, did not constitute constitutional violations. Most of the specific allegations against the summary judgment defendants are nearly identical to the accusations Plaintiffs levied against Bonnie Wessler, another social worker with whom DFS contracted to perform family therapy for the Schatz family. Plaintiffs complained that Bonnie Wessler:
[T]old children they had right to be mad at their parents and destroyed the authority of the family; improperly concluded that there was abuse in the children; through her counseling continuously undermined the parental authority; and made recommendation that children should be removed when she had not seen the children in 2 1/2 years.
Third Amended Complaint ¶ 171g.
As with many of the summary judgment defendants here, the undisputed evidence established that Wessler had no personal involvement in the removal of any of the Schatz children from their parents' home. This Court granted Wessler summary judgment on the basis of qualified immunity, concluding that, even assuming the allegations were true, no reasonable jury could find that Wessler violated any of the Plaintiffs' clearly established constitutional rights.
The Court's analysis of the claims against Wessler applies equally to defendants Houttuin, Vitoux, Schechtman, Schnidman, Powers,[9] Simmons, Savage, Long, Jones, and Roy. These defendants are one step removed from a child abuse investigation and the initial decision to remove the Schatz children from the family home. DFS removed all of the Schatz children from the family home except David on October 22, 1990. They were not the primary decisionmakers, but provided recommendations to the ultimate authority. The plaintiffs may not rest a federal constitutional claim and overcome the qualified immunity defense on bare allegations that the defendants' conclusions were wrong. The defendants have not violated the Plaintiffs' constitutional rights merely by reaching a conclusion the Plaintiffs dispute, and there is no evidence in this record to suggest that the defendants did not conduct meaningful evaluations of the Schatz children. In addition, the vast majority of analogous cases conclude that a *997 clearly established violation of a constitutional right does not occur when a fundamental right is balanced against a child abuse investigation. For these reasons, defendants Houttuin, Vitoux, Schechtman, Schnidman, Powers, Simmons, Savage, Long, Jones, and Roy are entitled to qualified immunity on the civil rights claims.
The plaintiffs have not stated constitutional violations against Defendants Ozark Youth Residential Services, Mark Owings, and Woody Friel because the record clearly establishes that they provided a facility for two Schatz children on a referral from DFS after a lawful court order. Finally, the Court finds that the plaintiffs have not stated a violation of the substantive component of the Due Process clause against defendants Fee-Fi-Fo-Fun Day Care, Joanne Gratzer, and Stephanie Light. Even assuming that these defendants asked Timothy if they could see his bottom to ascertain if he had bruises, they were reasonable in doing so after Timothy accused his father of spanking him. Their actions do not shock the conscience of this Court. Neither do their actions in making a hotline call after Timothy made accusations of abuse.
III. Conclusion
The Schatz family has failed to establish that any of the 49 defendants violated their constitutional rights that were clearly established at the relevant time. Thus the Court dismissed the claims against the defendants on all counts based upon qualified immunity. While the plaintiffs have attempted to state state law claims of improper funding, false imprisonment, and negligence, they have not made their complaint clear enough after three attempts to state which defendants correspond to which claims. The Court is unable to discern any violations of state law under the allegations listed in paragraph 71.
Therefore,
IT IS HEREBY ORDERED that Defendant Marsha Roy's Motion for Summary Judgment [doc. # 293] is GRANTED.
IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendants Ozark Youth Residential Services, Mark Owings, and Woodrow Friel [doc. # 295] is GRANTED
IT IS FURTHER ORDERED that Defendant Timothy Jones's Motion for Summary Judgment [doc. # 296] is GRANTED.
IT IS FURTHER ORDERED that Defendant Vicki Simmons's Motion for Summary Judgment [doc. # 299] is GRANTED.
IT IS FURTHER ORDERED that Defendant Cheryl Savage's Motion for Summary Judgment [doc. # 300] is GRANTED.
IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendants Fee-Fi-Fo-Fun Day Care, Joanne Gratzer, and Stephanie Light [doc. # 303] is GRANTED.
IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendants James Powers, Judith Schechtman, Monica Houttuin, Dina Vitoux, Joseph Long, and Robert Schnidman [doe. # 304] GRANTED.
IT IS FURTHER ORDERED that Defendant Marie Clark's Motion to Dismiss [doe. # 362] is GRANTED.
IT IS FURTHER ORDERED that the Motion for Ruling on Qualified Immunity by 21 defendants [doc. # 356] is GRANTED.
All 49 defendants are entitled to qualified immunity, and all claims against all defendants *998 are DISMISSED WITH PREJUDICE.
NOTES
[1] The 26 defendants were: Lynne Gierer, Tamee Bruenderman, Catherine Boone, Jae Anne Carder, Meredith Thibault, Pam Menefee, Page Rowbottom, Marsha Roy, Cheryl Savage, Timothy Jones, Ladonna Seegmiller, Julie Lindemann, Deborah Crocker, Denise Hughes, Linda Russell, Connie Juengel, Troy Pogue, Edna Phillips, Cheryl O'Brien, Shelia Hedgecorth, Susan Elrod, Donna Volner, Gerald Poepsel, Kathy Anderson, Patricia Bruns, and Ozark Center.
[2] Marsha Roy, Cheryl Savage, Timothy Jones, and Ozark Center did not appeal the Court's denial of their motions to dismiss, electing to filed these motions for summary judgment instead. The Court received a suggestion of Troy Pogue's death on August 1, 2002. In July 2003, the Court dismissed the plaintiffs' claims against Pogue because the plaintiffs did not make a motion for substitution of Pogue's estate within 90 days of the Court's receipt of the suggestion of death. See Fed. R.Civ.P. 25(a)(1).
[3] The Court received a suggestion of Defendant Priscilla Grier's death on October 8, 2003, and thus dismisses the plaintiff's claims against Grier with prejudice because the plaintiffs did not make a motion for substitution of Grier's estate within 90 days of that date. See Fed. R. Civ. P. 25(a)(1).
[4] Of the original 49 defendants, 21 are currently before the Court for a ruling on qualified immunity following the Eighth Circuit's dismissal of their appeal; 9 have been granted summary judgment, 2 are dead, 16 have now moved for summary judgment, and 1 moved to dismiss.
[5] Two circuits have eliminated their heightened pleading requirements in § 1983 cases based on Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In Crawford-El, the Supreme Court considered whether the circuit courts could craft special procedural rules for these cases to protect public servants from the burdens of trial and discovery that might impair the performance of their official duties. The more specific question in Crawford-El was whether, at least in cases brought by prisoners, plaintiffs could be required to adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment. Crawford-El, 523 U.S. at 578, 118 S.Ct. 1584. In discussing these two questions, the Court examined its holding in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the case establishing the current qualified immunity defense, in order to determine whether it required such a heightened pleading standard in § 1983 cases alleging improper motive on the part of government officials. In Harlow, the Court announced that a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent, according to the Court, is simply irrelevant to that defense. Crawford-El, 523 U.S. at 588, 118 S.Ct. 1584. The Court was quick to note in Crawford-El that the formulation of the qualified immunity defense "did not implicate the elements of the plaintiff's initial burden of proving a constitutional violation." Id. However, the way the District of Columbia Circuit had constructed the heightened pleading standard, it would be implicated regardless of whether a government official raised the qualified immunity defense. Id. at 589, 118 S.Ct. 1584. According to the Supreme Court, this was not "required by the holding in Harlow." Id.

Because, however, the holding of Crawford-El dealt specifically with heightened pleading standards in the context of improper motive claims against government officials at the summary judgment stage, and not at the pleading stage, Crawford-El has had little impact on the use of heightened pleading requirements in civil rights cases. Christopher M. Fairman, Heightened Pleading, 81 Tex. L.Rev. 551, 589-90 (2002); see also Lee v. City of Los Angeles, 250 F.3d 668, 679-80 n. 6 (9th Cir.2001) (reiterating the heightened pleading standard post Crawford-El); Judge v. City of Lowell, 160 F.3d 67, 73-75 (concluding that Crawford-El endorsed the First Circuit's requirement of pleading specific facts to support illegal motive) (emphasis added).
Nonetheless, both the Sixth and Tenth Circuits invalidated their heightened pleading requirements across the board based on Crawford-El. See Goad v. Mitchell, 297 F.3d 497, 503 (6th Cir.2002); Currier v. Doran, 242 F.3d 905, 916 (10th Cir.2001) (finding no difference between the D.C. Circuit's heightened burden of proof on summary judgment and its own heightened pleading requirement, and therefore, abandoning heightened pleading altogether based on Crawford-El). The Eighth Circuit has not discussed Crawford-El in this context.
[6] For example, in the first sentence of the paragraph, the plaintiffs allege that Bruenderman "changed the moral upbringing of the children contrary to parents' desires." The Court can not meaningfully address an allegation like this other than to say that it is deficient.
[7] The plaintiffs also allege that these defendants knew that David and Abigail Schatz were knowingly subjected to sexual abuse, brain washing, and smoking environments. They do not, however, allege how these defendants had any responsibility or jurisdiction to remedy that problem, or to put it another way, how their knowledge triggers liability.
[8] The other allegations in paragraph 71u concerning Marsha Roy, do not allege any facts which the Court can reasonably understand, and are thus not considered.
[9] With respect to Powers, the Court also notes that even if he did testify in a judicial proceeding, he would enjoy absolute immunity from § 1983 liability for anything he said. See Manzano v. Dep't of Social Servs., 60 F.3d 505, 512 (8th Cir.1995).